**REPUBLIC STEEL CORPORATION, Petitioner,**

v.

**Mary G. LEONARD and Director, Office of Workers' Compensation Programs, United States Department of Labor, Respondent.**

No. 79–2518.

United States Court of Appeals, Third Circuit.

Argued July 8, 1980.

Decided Nov. 6, 1980.

Edward A. McFarland, argued, Thomson, Rhodes & Grigsby, Pittsburgh, Pa., for petitioner.

Carin Ann Clauss, Sol. of Labor, Laurie M. Streeter, Associate Sol., Washington, D. C., Judith E. Wolf, Washington, D. C., Co–Counsel for Black Lung Benefits.

Peter A. Susser, argued, John S. Lopatto, III, U. S. Dept. of Labor, Washington, D. C., for Director, Office of Workers' Compensation Programs.

J. Scott Leckie, UMWA, District Five, Compensation Dept., Pittsburgh, Pa., for Mary G. Leonard.

Before WEIS, VAN DUSEN and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

Republic Steel Corporation petitions for review of a decision of the Benefits Review Board. The sole question raised is whether an award of benefits based on *ex parte* medical reports is constitutionally permissible. We hold that it is and will therefore deny the petition.

### I.

Earl Leonard, the miner upon whose employment history this case is based, died on July 17, 1975. His employment history shows that he had approximately forty–seven years of underground coal mining experience ending in January, 1974. On October 20, 1975, his widow filed a claim for benefits under Subchapter IV of the Federal Coal Mine Health and Safety Act of 1969 (FCMHSA), 30 U.S.C. §§ 901–945.[1] On January 24, 1978, a hearing was held on her claim in order to determine whether her husband had pneumoconiosis prior to his death and whether the pneumoconiosis, if present, was the cause of his death or was totally disabling at the time of his death.

The hearing officer found that Leonard had pneumoconiosis at the time of his death. He further found that the autopsy evidence was not determinative of the existence of pneumoconiosis and that Leonard's death was due to liver cancer rather than to any pulmonary or respiratory impairment. On the issue of whether Leonard was totally disabled due to pneumoconiosis at the time of his death, the hearing officer found that the ventilatory study evidence of record did not support a finding of total

---

1. On June 4, 1974, prior to his death, Leonard filed a claim for benefits. However, his counsel requested that the claim be withdrawn since any possible benefits awarded would be offset by black lung benefits previously awarded under Pennsylvania's Workers' Compensation Act. The hearing officer therefore dismissed this claim in his Decision and Order.

disability. However, he found that Leonard was totally disabled due to pneumoconiosis at the time of his death based upon "other relevant evidence of record," including the testimony of his widow, a medical report submitted by his regular physician and other medical reports documenting total disability due to pneumoconiosis.

The employer appealed the hearing officer's decision to the Benefits Review Board. The employer, however, did not argue the merits of the widow's entitlement, but rather questioned whether physicians' unsworn statements in medical reports, constituting fourteen exhibits, can constitute substantial evidence of entitlement and whether the use of such unsworn evidence violates the due process clause. The Board rejected employer's arguments and affirmed the award of benefits. This petition for review followed.

## II.

■ The Benefits Review Board, in rejecting the employer's arguments, relied principally on two cases. The first was *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), in which the Supreme Court held that written medical reports of examining physicians are admissible and may constitute substantial evidence to deny a claim under the disability provisions of the Social Security Act. This was so, the court reasoned, "despite its hearsay character and an absence of cross–examination, and despite the presence of opposing direct medical testimony by the claimant himself," *id.* at 402, 91 S.Ct. at 1427, where the party protesting the evidence has an opportunity to subpoena and cross–examine the reporting physician.

The Board also relied on *U. S. Pipe & Foundry v. Webb*, 595 F.2d 264 (5th Cir. 1979), in which the court construed *Perales* to apply to Part C of the Black Lung Benefits Act, the section of the statute under which the instant claim was brought.[2] For much the same reasons relied on by the Supreme Court in *Perales*, the court in *Webb* noted that:

> [T]he out–of–court declarants were not biased and had no interest in the result of the case; the opposing party could have obtained the reports before the hearing and could have subpoenaed the declarants; the reports were not inconsistent on their face; and courts have traditionally recognized that medical reports written by treating physicians are inherently reliable.

*Id.* at 270.

The employer raises two principal arguments against the application of these precepts. First, it argues that Part C proceedings are not governed by the evidentiary and cross--examination standards of the Social Security Act but by those of the Administrative Procedure Act (APA), which afford a party the right of cross–examination. It bases this argument on the fact that Section 422(a), 30 U.S.C. § 932(a), the enabling provision for Part C, specifically incorporates the hearing and evidentiary procedures of the Longshoremen's and Harbor Workers' Compensation Act (LHWCA) and that Section 19(d) of the LHWCA, 33 U.S.C. § 919(d), an incorporated provision under 30 U.S.C. § 932(a), in turn refers to Section 554 of the APA. Section 554(d) provides for the reception of evidence pursuant to Section 556. Section 556(d) provides that a party is entitled "to conduct such cross–examination as may be required for a full and true disclosure of the facts." The employer argues therefore that *Webb* is analytically distinct since it resulted from reasoning based on the premise that the provisions of the Social Security Act, rather than those of the LHWCA and the APA, apply to Part C claims and permit the ad-

2. The Black Lung Benefits Act is divided into three sections. Part A is a general authorizing and definitional section. Part B provides for a black lung benefits program administered by the Social Security Administration, with benefits paid from general federal revenues. Part C of the statute involves claims filed (in most cases) after January 1, 1974 and, in the absence of qualifying state black lung statutes, establishes a workers' compensation system making the last employer of a pneumoconiosis–stricken miner liable for compensation. Part C is administered by the Department of Labor.

mission of *ex parte* medical reports without cross–examination.

This same argument was rejected by the court in *Webb*. The court first noted that "the reference to the LHWCA is general rather than specific and that the referencing section must be construed in a way that effectuates the purposes of the FCMHSA as amended by the Black Lung Benefits Act." 595 F.2d at 269. The Court then referred to Section 413(b) of the FCMHSA, which provides, in relevant part:

> In determining the validity of claims under this part, all relevant evidence shall be considered, including, where relevant, medical tests such as blood gas studies, X–ray examinations, electrocardiogram, pulmonary function studies, or physical performance tests, and any medical history, evidence submitted by the claimant's physician, or his wife's affidavits, and in the case of a deceased miner, other appropriate affidavits of persons with knowledge of the miner's physical condition, and other supportive materials.

30 U.S.C. § 923(b). Finally, the Court concluded:

> One of the Social Security Act's provisions incorporated by reference into § 413(b) of the FCMHSA permits evidence to be received "at any hearing before the Secretary even though inadmissible under rules of evidence applicable to court procedure." 42 U.S.C. § 405(b). Section 413 is in Part B of the Black Lung Benefits Act, but this claim is brought under Part C. On its face, § 413 applies only to claims brought under Part B. Sections of Part B are, however, incorporated into Part C. *See, e. g.*, 30 U.S.C. § 932(c). The legislative history of the Black Lung Benefits Act of 1972 indicates that the Senate intended the applicable portions of Part B, as amended, to apply to Part C. S.Rep. No. 92–743, 92nd Cong., 2d Sess. 21, *reprinted in* [1972] *U.S.Code Cong. & Admin.News*, pp. 2305, 2325. Under Part C, a state workmen's compensation program is permitted to supplant the federal black lung benefits program only if its coverage is adequate

> for pneumoconiosis, its cash benefits are approximately equivalent to or greater than those provided by the federal program, and its standards for determining death or disability caused by pneumoconiosis are substantially equivalent to those used by the federal program 30 U.S.C. § 931. The evidentiary standards to be used in adjudicating a Part C claim when no applicable state program has been approved are certainly not intended to be more strict than those to be used in processing Part B claims.

595 F.2d at 269–70. The employer presents no persuasive basis for the rejection of the *Webb* rationale. Indeed, the employer cites no cases in support of its argument that the cross–examination rights under the APA and the Social Security Act are significantly different.

Moreover, the Supreme Court in *Perales* repudiated the argument that a Social Security Act proceeding is constitutionally flawed because of its inconsistency with the specific statutory right of cross–examination under Section 554 of the APA. The Court stated:

> These provisions conform, and are consistent with, rather than differ from or supersede, the authority given the Secretary by the Social Security Act's §§ 205(a) and (b) "to establish procedures," and "to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits," and to receive evidence "even though inadmissible under rules of evidence applicable to court procedure." Hearsay, under either Act, is thus admissible up to the point of relevancy.

402 U.S. at 409–410, 91 S.Ct. at 1431.

The employer's second argument concerns the applicability of *Perales* to this case. Republic argues that the regulations here, unlike those in *Perales*, "force an objecting employer to initially incur the unrecoverable expense of subpoenaing a reporting physician and paying the physician's expert witness fee or to be denied its right to

**210**

cross–examine critical medical evidence." Brief of Petitioner at 16. It argues that this cost factor distinguishes this case from *Perales* because in *Perales* the government bore the cost of witness fees when the claimant by subpoena sought cross-examination of the declarants of the medical reports.

We note first that the issue of cost is separate and distinct from that of cross-examination. The regulation in effect at the time of the hearing in this case only concerned the allocation of costs and not admissibility of evidence nor questions of cross–examination.[3] Second, in *Perales*, the Court attached no significance to, nor did it mention, the fact that the regulation there placed the cost of subpoenaing witnesses on the government. Instead, the Court stressed that the claimant was notified that the documentary evidence in his case was available for his inspection prior to the disability hearing. Likewise, in this case, the employer concedes that it had possession of the fourteen disputed exhibits prior to the hearing and chose not to avail itself of various discovery tools provided by the regulations.[4]

Moreover, we believe that our allowance of unsworn *ex parte* medical reports here comports with the same goals of reliability and probative value relied on by the court in *Perales* : independent, examining medical professionals, the vast workings of the black lung program which make for impartiality in the medical examinations, the inherent reliability and probative worth of written medical reports, even in formal trials, and the undesirable burden that would be placed on both the administration of the black lung program and on the energy of the nation's physicians if black lung medical examiners were required to attend each hearing. These latter concerns about the burden on the program and on physicians are more compelling as the number of black lung benefits claims continues to grow.[5]

### III.

*The Unattested Medical Reports Issue*

We do not laud the hearing judge for the manner in which the evidentiary issue as to the admission of the unattested medical reports was handled. However, on balance we do not think that his ruling and those of the Benefits Review Board constitute reversible error. Further, because of a unique change to the pertinent regulation, the issue as to the lack of attestation might now be moot and, therefore, not appropriate for remand.

The regulation in effect at the time of the hearing provided that "No claimant shall be required to bear the financial responsibility for producing an expert witness for cross examination if such expert wit-

3. The regulation provided:
   No claimant shall be required to bear the financial responsibility for producing an expert witness for cross examination if such witness, regardless of his availability to attend the hearing, has previously submitted depositions, interrogatories, or attested medical reports. Such expert witness, if he is required to attend the hearing shall be summoned and shall have his expert witness fee paid by the party in interest other than the claimant, who desires to cross examine such expert witness.
   20 C.F.R. § 725.464(c) (1978). The present version, recodified at 20 C.F.R. § 725.459(b), deletes the attestation requirement.

4. The regulations, among other things, required submission of copies of the evidence to all parties prior to the hearing, 20 C.F.R. § 725.151 (1978); permitted depositions or interrogatories, 20 C.F.R. § 725.463 (1978); provided for use of subpoenas, 20 C.F.R. § 725.403(a) (1970); and even allow adjournment and re-opening of a hearing for receipt of additional testimony or evidence, 20 C.F.R. § 725.457 and .460 (1978).

5. In response to this court's request at oral argument, the government has submitted an affidavit of the Director, Office of Workers' Compensation Programs which highlights this problem:

   [T]he number of claims referred by the Office of Workers' Compensation Programs to the Office of Administrative Law Judges of the Department of Labor for formal hearing in the current fiscal year is as follows by month:

| October | 1979: | 146 |
| November | 1979: | 401 |
| December | 1979: | 510 |
| January | 1980: | 558 |
| February | 1980: | 558 |
| March | 1980: | 864 |
| April | 1980: | 757 |
| May | 1980: | 1,074 |
| June | 1980: | 1,698 |

   ... [T]he Department of Labor presently forecasts that the number of black lung claims referred for formal hearing in Fiscal Year 1981 will total 18,000.

ness, regardless of his availability to attend the hearing, has previously submitted depositions, interrogatories, or *attested* medical reports. Such expert witness, if he is required to attend the hearing shall be summoned and shall have his expert witness fee paid by the party in interest other than the claimant, who desires to cross examine such expert witness." 20 C.F.R. § 725.464(c) (1978) (emphasis added). The present version recodified at 20 C.F.R. § 725.459(b) (1980) deletes the attestation requirements.

Counsel for the employer has acknowledged on ". . . the record that every exhibit offered by the claimant was in his possession prior to the hearing." 250A. At the hearing, counsel objected to exhibits 1 through 14 on the ground that they were all hearsay. The hearing officer "overruled the objection and entered all 14 of the challenged exhibits in the record, but indicated that [he] would afford counsel for the Employer an opportunity to depose any of the physicians or other medical personnel responsible for statements in those exhibits." 226A n.3. Exhibits 1–14 were primarily medical reports and letters by physicians: written statements of Doctor Hall, the claimant's regular treating physician; medical reports of Doctor Shedroe, a cardiologist, and medical reports of Doctors Massaro, Schiff, Freedman, and Clearfield. 237–39A. The hearing officer and the Board found that these medical and X-Ray reports were admissible and constituted reliable "substantial evidence." 247A. By the Board's regulation these reports should have been attested. 20 C.F.R. § 725.464(c) (1978). Nevertheless, they were considered without any attestation and were essential to the Board's finding that there was adequate substantive evidence to validate respondent's claim. 243A.

■ Counsel for the employer objected to these exhibits on several grounds. However, as we see the gravamen of petitioner's complaint, it does not seem to be primarily predicated on the fact that the reports were not attested to; rather, the crux of the petitioner's complaint was that because the doctors ". . . were not presented for cross

examination . . . the Employer [was deprived] of its due process right to confront and to cross examine adverse medical witnesses." Brief of Petitioner at page 5. The cross examination issue is not synonymous with the unattestation problem; for, even if the reports had been attested to, under the regulation petitioner would not have been entitled to have claimant produce the physicians at the hearing for the employer's cross examination. As we read the March 2, 1978 letter of counsel to the hearing officer, Exhibit BB–Brief of Petitioner at pages 21–23, it appears that counsel's major objection was not to the lack of attestation issue but it was primarily to the cross examination issue. For in his letter counsel stated, "None of the medical reports to which we have objected are attested. You have requested that we provide you and claimant's counsel with a list of those witnesses whom we would wish to cross examine should their reports be attested. *We respectfully decline to do so* inasmuch as we do not believe the circumstances here present require us to undertake the task of attempting to prove claimant's case by paying for the appearance of expert witnesses when claimant has not complied with the appropriate regulation." (emphasis added). Counsel's unwillingness to name the witnesses whose statements he desired attested is tantamount to a waiver of the prior objection to a lack of attestation. Rather than the extraordinary costs of this appeal, he could have spent 15 cents for a postal card to send a hand written list of the witnesses whose statements he desired to have attested.

IV.

*The Mootness Issue*

Attestation and cross examination are separate issues and we believe that counsel's correspondence indicates that the primary objection was predicated on the cross examination issues which we have previously discussed.

■ Yet, even if the attestation issue were the only issue in the case, we might be

inclined to remand if we were not confronted with a serious problem of mootness as the Board defined it by reason of the subsequent elimination of the attestation requirement:

> On March 1, 1978, the Black Lung Benefits Reform Act of 1977, Pub.L.No. 95–239, became law. The regulations required for the implementation of the Reform Act were promulgated and published in the *Federal Register* on August 18, 1978. 43 Fed.Reg. 36772 (1978). The amended counterpart to Section 725.-464(c) is Section 725.459(b), 43 Fed.Reg. 36799 (to be codified at 20 C.F.R. § 725.-459(b)). In the amended regulatory language of Section 725.459(b), the word "attested" has been deleted indicating that pursuant to the Reform Act an employer is always to bear the expense of cross–examination of expert witnesses who have submitted medical reports on behalf of the claimant. *Thus, if this claim were denied and submitted for rereview pursuant to the Reform Act,* (Section 15 of the Reform Act, Pub.L. 95–239, 92 Stat. 104 (to be codified at 30 U.S.C. § 945)), *the employer's issue with regard to attestations of medical reports would be rendered moot.*

246A n.2 (emphasis added).

## V.

*Conclusion*

When reduced to its essence, Republic pursues this case solely as a matter of obtaining tactical advantages in furtherance of its litigation strategy. It could have ferreted out whether Leonard in fact had pneumoconiosis by subpoenaing and cross–examining the medical experts whose reports were introduced. Republic chose not to avail itself of these opportunities. Instead, Republic relies on an ingenious incorporation scheme of comparing other legislation to support the argument that the Black Lung Benefits Act requires medical witnesses to appear for cross–examination. If

his claim was presented under the Social Security Act, the claimant could submit written medical opinions without the physician being present; we see no reason on either policy grounds or by statutory requirement why a miner or his widow claimant should have a more strenuous evidentiary standard for the presentation of evidence.

Accordingly, the petition for review will be denied.

VAN DUSEN, Senior Circuit Judge, concurring.

I respectfully disagree with the point of view taken in part III of the majority opinion because I believe the right of cross–examination of the experts, whose medical reports are offered in cases such as this, is more important than is stated in the majority opinion, which suggests that the employer had an obligation to tell the claimant how to prove her case inexpensively by sending notice of doctors' reports that should be attested if the claimant wished to impose on the employer the burden and cost of producing such experts so that he may cross–examine them. See 20 C.F.R. § 725.-464(c) (1978), which provided at the time of the administrative hearing in this case that the claimant will not be relieved of the cost of producing an expert for cross–examination unless his or her report was offered in attested form.[1]

Contrary to the implication of the majority opinion on page 211, the cross–examination issue seems to me to have been vitally connected with the unattestation issue. Since the reports were unattested, under the regulations the claimant was required to pay for the costs of producing their authors for cross–examination, so that the employer came to the hearing justifiably relying on the expectation that the experts making the unattested reports would be present for cross–examination if his or her report was to be given weight.[2] None of

---

1. Approximately 10 unattested medical reports were received in evidence in this case.

2. See *Goldberg v. Kelly,* 397 U.S. 254, 269–70, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970), where the Court said:

the experts was present and a letter subsequent to the hearing from the hearing officer asked the employer's counsel to specify which of the authors of these reports he wished to cross–examine. At the least, it would have been appropriate for the hearing officer to have asked the claimant's attorney for some explanation of why the reports had been submitted in unattested form, in view of the absence of the experts from the hearing, since the majority concedes (page 211 of opinion) that these medical reports "were essential to the Board's finding that there was adequate substantive evidence to validate respondent's claim."

In my view the preferable course would have been to remand this case to the Benefits Review Board for re–review, with directions (a) to give the parties an opportunity to present argument on whether the regulation (29 C.F.R. § 725.464(c) (1978)) or the present amended regulation (20 C.F.R. § 725.459(b) (1980)), which does not require such attestation for admissibility in evidence, would apply on rehearing; and (b) if the 1978 regulation is applicable, for remand to the administrative hearing officer for such rehearing.[3]

I believe the foregoing is the focus of the petitioner's argument in its letter of March 2, 1978, to the hearing officer (Exhibit BB to its brief) and at pages 15 ff. of its brief filed in this court in support of its petition for review.

> "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross–examine adverse witnesses. *E. g., ICC v. Louisville & N. R. Co.*, 227 U.S. 88, 93–94, 33 S.Ct. 185, 187–188, 57 L.Ed. 431 (1913); *Willner v. Committee on Character & Fitness*, 373 U.S. 96, 103–104, 83 S.Ct. 1175, 1180, 10 L.Ed.2d 224 (1963). What we said in *Greene v. McElroy*, 360 U.S. 474, 496–497, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959), is particularly pertinent here:
>
> 'Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individ-

However, the determination of whether fundamental fairness was granted the employer by giving it after the hearing the opportunity to specify the experts it wished to cross–examine is a close one. Hence I join in the judgment of the majority.

ual so that he has an opportunity to show that it is untrue. . . . This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases, . . . but also in all types of cases where administrative . . . actions were under scrutiny.'
"Welfare recipients must therefore be given an opportunity to confront and cross–examine the witnesses relied on by the department."

3. I believe the Board did not have the authority to, or intend to, decide this issue by its comment in note 2 of its opinion (246A) on mootness when the parties had not had the opportunity to present argument on the point. See part IV of the majority opinion.